IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| CHARLES RUDOLPH, | ) | CIVIL NO. 07-00225 SOM-BMK |
| | ) | |
| Plaintiff, | ) | |
| | ) | ORDER COMPELLING COMPLIANCE |
| vs. | ) | WITH DISPUTE RESOLUTION |
| | ) | PROVISIONS OF THE SALES |
| TOPSIDER BUILDING SYSTEMS, | ) | AGREEMENT AND THE DESIGN |
| INC., a North Carolina | ) | SERVICES AGREEMENT; ORDER |
| corporation, et al, | ) | DISMISSING COMPLAINT |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

ORDER COMPELLING COMPLIANCE WITH DISPUTE RESOLUTION PROVISIONS OF THE SALES AGREEMENT AND THE DESIGN SERVICES AGREEMENT; ORDER DISMISSING COMPLAINT

I.      INTRODUCTION.

As this court explained in its earlier order denying a motion to dismiss for lack of personal jurisdiction, this is a diversity action concerning agreements between Topsider Building Systems, Inc., a North Carolina company, and Charles Rudolph, a former citizen of North Dakota who is now a citizen of California.  Topsider supplied Rudolph with prefabricated components for a house Rudolph built in Hilo, Hawaii.  Rudolph claims Topsider breached its agreements, and Topsider now moves to compel arbitration of this matter and to dismiss this case. The court compels compliance with the dispute resolution provisions contained in the agreements and dismisses Rudolph's complaint.

II.     BACKGROUND FACTS.

While a North Dakota citizen, Rudolph negotiated with Topsider, a North Carolina corporation, for the sale of prefabricated components for a house Rudolph wanted to build in Hilo, Hawaii. Declaration of Charles Rudolph, M.D. (July 4, 2007) ¶¶ 4, 9, 10.

On or about January 18 to 20, 2001, Rudolph and Topsider entered into a Sales Agreement, a copy of which is attached to Defendants' motion as Exhibit 6. Although Rudolph's Opposition to the motion says that the Sales Agreement was presented to Rudolph on a "'take it or leave it' basis without any meaningful negotiation," see Opposition (July 6, 2007) at 1, Rudolph admits he did negotiate for certain terms to be included in it. See, e.g., Aff. of Sheldon J. Storer (June 11, 2007) ¶ 33; Sales Agreement (indicating that Rudolph had negotiated provisions requiring Rudolph to make certain payments in return for Topsider's maintaining of the "current pricing"). The Sales Agreement is a two-page document on 8½ x 14-inch paper. See Storer Aff. ¶ 6. The font size, although small, is uniform throughout the agreement. The last paragraph on the first page of the agreement states:

> 13. Dispute Resolution: Any dispute between Seller [Topsider] and Purchaser [Rudolph] arising under or related to this Agreement, including without limitation the arbitrability of such dispute, shall be resolved by arbitration in Winston-Salem,

>North Carolina, USA, under the rules of the
>American Arbitration Association.  Before
>proceeding to or scheduling arbitration,
>however, the parties agree to diligently work
>toward resolving the dispute, specifically by
>first discussing and corresponding about the
>facts in disagreement; then failing
>resolution, by jointly employing a
>knowledgeable conciliator to hear or receive
>the positions of each party and make
>recommendations; third, should resolution not
>then be reached, the parties agree that any
>such dispute shall require the Purchaser to
>participate in face-to-face mediation in
>Winston-Salem, North Carolina, USA under the
>mediation rules of the American Arbitration
>Association.  If none of these three
>consecutive strategies of resolution are
>successful, then the parties will schedule
>and proceed to arbitration.

Sales Agreement ¶ 13.

In February 2001, Rudolph and Topsider also entered into a one-page Design Services Agreement on one page of 8½ x 14-inch paper, a copy of which is attached as Exhibit 7 to the motion.  Rudolph Decl. ¶ 12; Storer Aff. ¶ 6.  The small font size is uniform throughout the fourteen-paragraph agreement. Paragraph 12 contains a "Dispute Resolution" provision almost identical to the one contained in the Sales Agreement.  There is only an immaterial difference between the two provisions.  The Design Service Agreement's provision states that its dispute resolution paragraph applies to "[a]ny dispute between Seller [Topsider] and Purchaser [Rudolph] arising from, or related to this Agreement."  The Sales Agreement's provision applies to

"[a]ny dispute between Seller [Topsider] and Purchaser [Rudolph] arising under or related to this Agreement."

It appears that the February 2001 Design Services Agreement replaced a similar January 2000 agreement. See Design Services Agreement (Jan. 28, 2000) (attached to Plaintiff's Concise Statement (July 5, 2007) as Ex. C). This earlier agreement was only a single page, containing 10 numbered paragraphs. This agreement also contained a dispute resolution provision that called for escalating alternative dispute resolution techniques to settle disputes. This provision was located directly above Rudolph's signature.

Although the Sales Agreement was only two pages, and although the Design Services Agreement was only a single page, Rudolph says that he did not agree to arbitrate or mediate his dispute because he did not read the dispute resolution paragraphs contained in those documents. Rudolph Decl. ¶ 30. Topsider now seeks to enforce the paragraphs. Topsider styles its request as an attempt to compel arbitration, ignoring in its moving papers the precursors to arbitration required by the agreements. However, at the hearing on its motion, Topsider agreed that the court could construe the motion as seeking enforcement of the dispute resolution provisions in their entirety, not just of the arbitration provisions.

III.     ANALYSIS.

     A.     This Court Analyzes the Enforceability of the Agreements Under Ordinary Contract Principles.

The parties do not dispute the existence of the dispute resolution provisions of the Sales Agreement and the Design Services Agreement. Rudolph challenges the enforceability of the dispute resolution provisions, claiming that those provisions are unconscionable. This challenge is not to the unconscionability of the agreements themselves, but only to the unconscionability of the dispute resolution provisions, and it is this court, rather than an arbitrator, that decides whether those provisions are valid and enforceable. See Nagrampa v. MailCoups, Inc., 469 F.3d 1257, 1263-64 (9th Cir. 2006) (en banc).

The agreements do not contain the typical arbitration provisions through which parties agree to arbitrate all disputes arising out of a contract. To the contrary, the agreements have "Dispute Resolution" provisions. These provisions call for escalating alternative dispute resolution techniques. Initially, the parties are required to diligently work towards resolving issues themselves. If that fails, the dispute resolution provisions require the parties to employ a knowledgeable conciliator to listen to the parties' positions and make recommendations. If the conciliator fails to resolve a dispute, then the dispute resolution provisions require the parties to mediate the dispute. If mediation fails to resolve the dispute,

5

the dispute resolution provisions require arbitration of the dispute.

To the extent that the Sales Agreement and Design Services Agreement can be said to call for arbitration of disputes related to the sale of the house components by Topsider to Rudolph, the agreements are subject to the FAA as "contract[s] evidencing a transaction involving commerce." See Chiron Corp. v. Ortho Diagnostic Sys., 207 F.3d 1126, 1130) (9th Cir. 2000) (quoting 9 U.S.C. § 2); 9 U.S.C. § 2.  The FAA provides that arbitration agreements "are generally valid and enforceable, 'save upon such grounds as exist at law or equity for the revocation of any contract.'"  Nagrampa, 469 F.3d at 1264-65 (quoting 9 U.S.C. § 2); accord Perry v. Thomas, 482 U.S. 483, 492 n.9 (1987) (stating that arbitration contracts are to be treated the same as other contracts, and that state law governs the validity, revocability, and enforceability of such contracts). Under the FAA, a court's role is limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue. Chiron Corp., 207 F.3d at 1130; Lenhart v. Westfield Fin. Corp., 909 F. Supp. 744, 748 (D. Haw. 1995) (citations omitted).  If the response is affirmative on both counts, then the FAA requires the court to enforce the arbitration agreement in accordance with its terms.  Chiron Corp., 207 F.3d at 1130.  Congressional

6

policy, as embodied in the FAA, favors enforcement of such arbitration clauses. See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 625-26 (1985).

Courts determine whether an arbitration agreement is enforceable by applying "ordinary state-law principles that govern the formation of contracts." Circuit City Stores, Inc. v. Adams, 279 F.3d 889, 892 (9th Cir. 2002) (internal citations omitted). Unconscionability is one contractual basis for an arbitration agreement to be deemed unenforceable. See Davis v. O'Melveney & Myers, 485 F.3d 1066, 1072 (9th Cir. 2007) (analyzing in part whether an arbitration agreement was unenforceable due to unconscionability). Whether this court analyzes the dispute resolution agreements as ordinary contracts or as broad arbitration agreements subject to the FAA, the court applies ordinary contract principles to determine the enforceability of those provisions.

The court's inquiry as to whether an agreement to arbitrate exists is a contract issue governed by state law. See Perry, 482 U.S. at 492 n.9. The Sales Agreement contains a choice-of-law provision: "In any arbitration or action brought in relation to any provision of this [Sales] Agreement . . . [,] the parties agree that all aspects of the Agreement . . . shall be governed by and construed in accordance with the law of the State of North Carolina, USA." Sales Agreement ¶ 16. The Design

7

Services Agreement also calls for the application of North Carolina law.  See Design Services Agreement ¶ 14.  In determining whether to apply North Carolina law as provided for in the documents, the court examines Hawaii's choice-of-law rules.  See Unified W. Grocers, Inc. v. Twin City Fire Ins. Co., 457 F.3d 1106, 1111 (9th Cir. 2006) ("'In determining what state law to apply, a federal court applies the choice-of-law rules of the state in which it sits.'" (quoting Kohlrautz v. Oilman Participation Corp., 441 F.3d 827, 833 (9th Cir. 2006)).

In Hawaii, the determination of which state's law to apply follows "the modern trend towards a more flexible approach looking to the state with the most significant relationship to the parties and subject matter."  Unified W. Grocers, 441 F.3d at 833.  North Carolina is the state with the most significant relationship to the parties and the subject matter.  Topsider is a North Carolina company that negotiated with a North Dakota citizen for the purchase of prefabricated housing components.  These negotiations resulted in agreements calling for the application of North Carolina law and the shipping of housing components from North Carolina to Hawaii.  The court therefore applies North Carolina law to determine the validity of the parties' agreement to settle disputes outside of the court system.  However, the court notes the outcome would be the same under Hawaii law.

B.   <u>Valid Agreements to Arbitrate Exist.</u>

North Carolina law, like Hawaii law, requires both procedural and substantive unconscionability to declare an arbitration agreement unenforceable. "To find unconscionability, there must be an absence of meaningful choice on part of one of the parties [procedural unconscionability] *together with* contract terms which are unreasonably favorable to the other [substantive unconscionability]." <u>Raper v. Olive House, LLC</u>, 637 S.E.2d 551, 555 (N.C. App. 2006) (internal citations omitted); <u>accord</u> <u>Brown v. KFC Nat'l Mgmt. Co.</u>, 82 Haw. 226, 247, 921 P.2d 146, 167 (1996) ("a contract . . . is unenforceable if two conditions are present: (1) the contract is the result of coercive bargaining between parties of unequal bargaining strength; and (2) the contract unfairly limits the obligations and liabilities of, or otherwise unfairly advantages, the stronger party.").

> Procedural unconscionability involves bargaining naughtiness in the formation of the contract, i.e., fraud, coercion, undue influence, misrepresentation, inadequate disclosure.  Substantive unconscionability involves the harsh, oppressive, and one sided terms of a contract, i.e., inequality of the bargain.  The inequality of the bargain, however, must be so manifest as to shock the judgment of a person of common sense, and the terms so oppressive that no reasonable person would make them on one hand, and no honest and fair person would accept them on the other.

<u>Raper</u>, 637 S.E.2d at 555 (internal citations omitted); <u>accord</u> <u>Branco v. Norwest Bank Minn., N.A.</u>, 381 F. Supp. 2d 1274, 1280-81

(D. Haw. 2005) (discussing procedural and substantive unconscionability under Hawaii law).

Consistent with congressional policy to enforce private agreements to arbitrate, North Carolina courts hold that, "[i]n the absence of any evidence of bad faith, inequality, or lack of mutuality . . . , the inclusion of an agreement to arbitrate is neither procedurally or substantively unconscionable." Raper, 637 S.E.2d at 555; see also Branco, 381 F. Supp. 2d at 1280 ("Arbitration agreements are not usually considered contracts of adhesion, because while they may meet the procedural element of unconscionability, they generally do not meet the substantive element of unconscionability.  Arbitration agreements usually do not limit the obligations or liabilities of either party, but simply substitute one forum for another." (citing Leong v. Kaiser Found. Hosp., 71 Haw. 240, 788 P.2d 164, 169 (1990)).

Rudolph has the burden of proving unconscionability here.  Raper, 637 S.E.2d at 554-55 ("Unconscionability is an affirmative defense and the party asserting the defense bears the burden of proof."); accord First Trust Co. of Hilo, Ltd. v. Reinhardt, 3 Haw. App. 589, 593, 655 P.2d 891, 894 (1982) (placing burden of proof on party seeking to hold agreement unconscionable).  Rudolph argues the dispute resolution provisions are unconscionable because the agreements were part of standardized contracts drafted entirely by Topsider and presented

on a "take it or leave it" basis, the parties had unequal bargaining power and there was no room for meaningful negotiation, and the dispute resolution provisions were "hidden in the pre-printed standard agreements" and "buried in the middle of both agreements, which was neither read nor understood by Randolph." Opp. at 21-24. These bases do not satisfy Rudolph's burden of demonstrating that the dispute resolution provisions are unconscionable.

First, Rudolph fails to demonstrate that the agreements were presented on a "take it or leave it" basis. He was able to bargain for and negotiate substantive changes to the agreements, including changes concerning price, design, and delivery. Even though the agreements may have started out as standardized contracts drafted by Topsider, they were clearly open to negotiation as to some terms. It is therefore not at all a given that, had Rudolph objected to other provisions, Topsider would have refused to negotiate. As it turns out, Rudolph admittedly did not even attempt to negotiate the dispute resolution provisions, as he did not even read those provisions.

Rudolph is bound by the dispute resolution language contained in the agreements, even though he says he did not read that language. See Raper, 637 S.E.2d at 555 ("Persons entering contracts have a duty to read them and ordinarily are charged with knowledge of their contents." "[T]he law will not relieve

11

one who can read and write from liability upon a written contract, upon the ground that he did not understand the purport of the writing, or that he has made an improvident contract, when he could inform himself and has not done so." (quotations, citations, and ellipses omitted)); accord Leong v. Kaiser Found. Hosps., 71 Haw. 240, 245-246, 788 P.2d 164, 168 (Haw. 1990) ("The general rule of contract law is that one who assents to a contract is bound by it and cannot complain that he has not read it or did not know what it contained.").

    Second, Rudolph's failure to read the provisions is not excused by the manner in which those provisions were contained in the agreements. Rudolph does not say that he failed to read the dispute resolution provisions <u>because</u> of the manner in which they were written. Rudolph's declaration merely characterizes the provisions as being "fine print boilerplate provisions" and then states that he did not read them. <u>See</u> Rudolph Decl. ¶ 30 ("the fine print boilerplate provisions in the contracts . . . were not read or understood by me"). The dispute resolution provisions were not buried in a long contract. Instead, the dispute resolution provisions were located on the first page of the two-page Sales Agreement and on the single page of the Design Services Agreement. The provisions were in the same font as the rest of the contractual provisions, and the words "Dispute Resolution" were clearly written immediately after the number of

the paragraph.  These provisions were similar to a previously agreed to provision located immediately above Rudolph's signature in a one-page January 2000 contract.  The dispute resolution provisions were not hidden from Rudolph.  Having shown no "procedural naughtiness," Rudolph has failed to demonstrate procedural unconscionability.  See Raper, 637 S.E.2d at 555 ("procedural naughtiness" necessary to find an agreement unconscionable); Prell v. Silverstein, __ P.3d __, 2007 WL 1549094, *14  (Haw. App. 2007) (unfair surprise necessary to find an agreement unconscionable).

     Nor is the court persuaded that the arbitration provisions are substantively unconscionable, as Rudolph argues.  Rudolph contends that arbitrating in North Carolina would result in a "one sided benefit for Topsider, who is headquartered in North Carolina, and a sever[e] disadvantage to Rudolph, who is several thousands of miles from North Carolina and would have to expend significant time and money to arbitrate in this forum."  Opp. at 27-28.  Rudolph says that the one-sidedness of the provisions is demonstrated by his "astronomical" costs if his counsel and witnesses have to travel to North Carolina.  Id.  This mere contention does not establish that the arbitration provisions are so one-sided and unfair as to "shock the judgment of a person of common sense."  Raper, 637 S.E.2d at 555; see also Prell, __ P.3d at __, 2007 WL 1549094, *14 (noting that, under

13

Hawaii law, an agreement may be unconscionable when it is "unacceptably one-sided" and involved unfair surprise). The provisions are binding on both parties. In any event, the agreements do not require the initial steps of discussion and conciliation to be in North Carolina. Topsider has even offered to waive the requirement of face-to-face mediation and arbitration in North Carolina. See Ex. 26 (Letter from Marc H. Eppley to Alan H. Tuhy (Aug. 9, 2005)).

Informal discussions, conciliation, and mediation do not typically require the presentation of evidence, and any arbitration could proceed, according to Topsider's offer, with evidence presented by telephone, facsimile, email, mail, and other means. See Ex. L (Letter from Marc H. Eppley to Alan H. Tuhy (Aug. 9, 2005)). Under these circumstances, Rudolph does not show that he would suffer costs so "prohibitive" that the dispute resolution provisions are unenforceable. See Tillman v. Commercial Credit Loans, Inc., 629 S.E.2d 865, 870 (N.C. App. 2006) (citing Green Tree Fin. v. Randolph, 531 U.S. 79, 90 (2000)) (holding that the party seeking to invalidate the arbitration agreement did not satisfy its burden of demonstrating that the costs of arbitration were prohibitively expensive when that party merely speculated about the costs of arbitration and failed to compare the costs of arbitration with the costs of trial); see also Branco, 381 F. Supp. 2d at 1282 ("Where a party

seeks to invalidate an arbitration agreement because of potentially prohibitive costs, that party bears the burden of showing the likelihood of incurring such costs.").

At the hearing on this motion, Rudolph conceded that he could have purchased the components for his home from another company. This is another factor indicating that the dispute resolution provisions are not unconscionable. See Revels v. Miss N.C. Pageant Org., Inc., 627 S.E.2d 280, 283 (N.C. App. 2006) ("Revels further argues that the arbitration clause was unenforceable where the inequality of bargaining power deprived her of a meaningful choice. However, Revels freely and willingly decided to enter the Miss North Carolina Pageant in which each contestant was required to sign this agreement. Where Revels could enter other pageants or choose to not enter a pageant at all, we find that this contention lacks merit."); Alpiser v. Eagle Pontiac-GMC-Isuzu, Inc., 389 S.E.2d 293, 296 (N.C. App. 1990) ("We do not think the lease in question is unenforceable for unconsionability. Presumably, plaintiff was not under any compulsion to lease the vehicle and could have acquired it outright through conventional financing."); accord Branco, 381 F. Supp. 2d at 1280-81 (noting that, under Hawaii law, "Plaintiffs were not subjected to 'oppression' or a lack of all meaningful choice because they were negotiating in a market place with competing lenders"; ruling that "Plaintiffs also were

not 'oppressed' or left without any meaningful choice in the matter: they could have refused Defendants' terms and chosen to transact business with a different lender"). Rudolph counters by citing Nagrampa for the proposition that the "availability in the marketplace of substitute employment, goods, or services" does not, by itself, defeat a claim of unconscionability. 469 F.3d at 1283. However, Nagrampa applied California, not North Carolina law, and is therefore inapposite.

Given Rudolph's failure to demonstrate either procedural or substantive unconscionability, valid dispute resolution agreements exist.

C. The Agreements Encompass the Dispute at Issue.

All of Rudolph's claims fall within the broad dispute resolution clauses, which govern "[a]ny dispute between Seller [Topsider] and Purchaser [Rudolph] arising from, or related to this Agreement" and "[a]ny dispute between Seller [Topsider] and Purchaser [Rudolph] arising under or related to this Agreement." The Ninth Circuit has broadly construed the language "arising in connection with" to reach "every dispute between the parties having a significant relationship to the contract and all disputes having their origin or genesis in the contract." See Simula, Inc. v. Autoliv, Inc., 175 F.3d 716, 721 (9th Cir. 1999). The language in the agreements is at least as broad as the language in Simula. Accordingly, arbitration is required as long as Rudolph's factual allegations "touch matters" covered by the

16

agreements.  See id.; accord Panepucci v. Honigman Miller Schwartz, Cohn, LLP, 408 F. Supp. 2d 374, 380 (E.D. Mich. 2005) (stating that a presumption of arbitrability applies to broad arbitration clauses such as those requiring arbitration of "a controversy or claim arising under or related to" an agreement or its interpretation; holding that, when claims cannot be resolved without consideration or interpretation of the agreement itself, those claims "relate to" the agreement and are therefore arbitrable under such a broad arbitration clause).

Rudolph asserts claims for breach of contract (Count I), negligence (Count II), breach of express and implied warranties (Count III), declaratory relief that the agreements are unconscionable (Count IV), and unfair and deceptive trade practices (Count V).  Rudolph is dissatisfied with the product that Topsider shipped to him, as well as the manner in which the product was shipped.  Each of these claims "arises under," "arises from," or "relates to" the agreements because each is based on actions taken by Topsider in furtherance of its obligations under the agreements.

> D.  As This Action Was Filed Before Compliance With the Dispute Resolution Provisions of the Agreement, the Action is Dismissed.

Because there are valid dispute resolution agreements between the parties that encompass all of Rudolph's claims, this court dismisses the Complaint and compels compliance with the

dispute resolution provisions of the agreements.[1]  It appears that the parties have attempted to informally resolve their issues.  However, nothing in the record indicates that the parties asked a conciliator to help them resolve their differences.  Nor is there anything in the record indicating that the parties mediated their disputes.  Unless the parties agree otherwise, they must follow the escalating alternative dispute resolution provisions contained in the agreements.  Should informal talks, conciliation, and mediation fail to settle the matter's raised in the Complaint, the parties must arbitrate Rudolph's claims.

At the hearing, Rudolph requested that, if the court compels compliance with the dispute resolution provisions, the court stay this case under 9 U.S.C. § 3.  That section provides that, if a matter filed in this court is arbitrable, this court "shall . . . stay the trial of the action until such arbitration

---

[1] Topsider has asserted its own claims against Rudolph and is seeking arbitration of those claims in North Carolina.  Rudolph argues that Topsider is flouting the dispute resolution provisions' unambiguous requirement of other procedures "[b]efore proceeding to or scheduling arbitration."  Rudolph's challenge to Topsider's arbitration demand of its own claims against Rudolph is beyond the scope of this lawsuit.  Topsider has not filed counterclaims in this court, and this court leaves it to the arbitrator in North Carolina to determine whether the pending arbitration is or is not permissible.  The court notes in passing that there is an inconsistency between Rudolph's challenge to Topsider's failure to complete the other dispute resolution procedures and Rudolph's own decision to skip all of the alternative dispute resolution procedures by filing the present lawsuit.

has been had in accordance with the terms of the agreement." Although § 3 appears to require this court to stay a case, rather than dismiss it, the Ninth Circuit has interpreted § 3 as allowing dismissal of a complaint when a court determines that all claims asserted in the complaint should be arbitrated. See Sparling v. Hoffman Const. Co., 864 F.2d 635, 638 (9th Cir. 1988); accord Thinket Ink Info. Res., Inc. v. Sun Microsystems, Inc., 368 F.3d 1053, 1060 (9th Cir. 2004) ("Nor did the district court err in dismissing the plaintiffs' claims that were subject to arbitration" under the FAA).  The court declines to exercise continuing jurisdiction over Rudolph's claims on the mere possibility that the parties will be unable to agree on how to comply with the dispute resolution provisions of the agreements. That is, disputes regarding the contours of the alternative dispute resolution techniques--e.g., whether a mediation should be ten or twelve hours--are not the kinds of issues that would justify a stay, rather than dismissal, of this action.  Because the dispute resolution provisions will result in either settlement or an arbitration award deciding all of the claims raised in Rudolph's Complaint, dismissal is appropriate.

IV.     CONCLUSION.

For the foregoing reasons, the court compels the parties to comply with the dispute resolution provisions

contained in the Sales Agreement and Design Services Agreement. The court therefore dismisses Rudolph's Complaint.

The Clerk of Court is directed to close this case.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, July 26, 2007.

/s/ Susan Oki Mollway
Susan Oki Mollway
United States District Judge

Rudolph v. Topsider Building Systems, Civ. No. 07-00225 SOM/BMK; ORDER COMPELLING COMPLIANCE WITH DISPUTE RESOLUTION PROVISIONS OF THE SALES AGREEMENT AND THE DESIGN SERVICES AGREEMENT; ORDER DISMISSING COMPLAINT